IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>  Plaintiff,  )<br>  )<br>v.  )<br>  )<br>GIOVONNI THOMAS,  )<br>  )<br>  Defendant.  ) | Case No. 10-30046 |

OPINION

RICHARD MILLS, United States District Judge:

Defendant's supplemental motion for compassionate release is before the Court.

Giovonni Thomas moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), on the basis of extraordinary and compelling reasons.

The Defendant alleges that the Bureau of Prisons (BOP) facility where he is housed (FCI Elkton) has become overrun with the coronavirus, to such an extent that it renders his continued incarceration a danger to his health and safety. Moreover, the Defendant has a medical history which includes sickle cell anemia, a condition that the CDC now identifies as creating a high risk of serious illness or death from

1

contracting COVID. The Defendant notes that if he were sentenced today, he would no longer qualify for sentencing as a career offender under *Johnson v. United States*, 576 U.S. 591 (2015) and his guideline range would have been significantly lower.

The Government claims the Defendant has not shown extraordinary and compelling reasons to grant compassionate release.

## I.   BACKGROUND

On September 16, 2011, the Court sentenced the Defendant to serve 192 months' imprisonment, followed by a 5-year term of supervised release, following his guilty plea to one count each of Possession of Cocaine with Intent to Distribute, in violation of 21 U.S.C. § 841(b)(1)(C); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g). The Defendant has been in custody since May 21, 2010, and has a current projected release date of February 4, 2024.

The Defendant is a 38-year old black man serving his sentence at FCI Elkton. At the time of the Defendant's pro se motion and amended motion, FCI Elkton was experiencing an epidemic of confirmed coronavirus cases—240 inmates and 7 staff members had active infections at the time (which was up from 89 inmates and 12 staff members on May 13, 2020), and 9 inmate deaths had resulted due to COVID. The Defendant's motion provides that of the 2,247 inmates at FCI Elkton, 815 had

at that point tested positive, indicating an infection rate of 36% of its inmate population.

The BOP website now reports that two inmates at FCI Elkton are currently infected with COVID, while 2 staff members are infected. www.bop.gov/coronavirus (last visited August 19, 2020). There have been 9 inmate deaths and no staff member deaths due to COVID. *Id*. A total of 982 inmates and 51 staff members have recovered at FCI Elkton. *Id*.

The Defendant states that, while he does not suffer from any of the health conditions previously identified by the CDC as creating a high risk from the virus, the CDC recently issued new guidelines for what conditions create such a risk. On June 25, 2020, the CDC added individuals with sickle cell anemia and other hemoglobin disorders to the list of conditions that creates a high risk of serious complications, including death, from coronavirus. The Defendant claims that this condition along with the dire circumstances at FCI Elkton create such a unique and significant risk to his health that compassionate release is warranted. Based on the length of time he has already served along with the minimal time left on his sentence and the circumstances created by the pandemic, the Defendant claims the Court should exercise its discretion and consider releasing the Defendant to an early period of home confinement.

The Government states that the most recent BOP medical records which have been filed under seal provide that the 38-year old Defendant is not suffering from any serious medical condition. He tested negative for COVID-19 on May 13, 2020, and June 23, 2020.

On April 3, 2020, Attorney General Barr made the finding that emergency conditions are materially affecting the functioning of the BOP, thereby allowing the BOP Director to review all inmates for home confinement. The Attorney General's Memorandum explained that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations." There have been calls from legal experts for the Attorney General to expand the home confinement program even further. Moreover, multiple United States Senators have recently voiced concern over BOP's attempts to curb the spread of the virus and their non-responsiveness to the call to release medically vulnerable inmates.

As of August 17, 2020, 113 BOP inmates and 1 BOP staff member have died of the coronavirus. www.bop.gov/coronavirus. A total of 43,872 inmates have completed tests and there are 1,830 pending tests for inmates who have not yet been tested. *Id*. There have been 11,328 positive tests among the inmate population and 1,405 among BOP staff. *Id*. The Defendant's motion notes that it is unknown

exactly how many positive cases of COVID-19 have occurred throughout BOP because of a lack of testing. As of August 16, 2020, there are 127,901 inmates at BOP facilities, which means 35.7% of inmates have been tested (including those tests that are currently pending).

The Defendant notes that the risk is not confined to the elderly—most of the now-deceased inmates were, like the Defendant, under the age of 65. The overwhelming majority had "pre-existing medical conditions which the CDC lists as risk factors" for developing more severe COVID-19 symptoms.

## II. DISCUSSION

### (A)

Since President Trump signed the First Step Act into law on December 21, 2018, defendants may now bring their motions for compassionate release after exhausting administrative remedies within the Bureau of Prisons ("BOP"). *See* 18 U.S.C. § 3582(c)(1)(A). The law provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on "extraordinary" or "compelling" reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]." *See* 18 U.S.C. § 3582(c)(1)(A).

Before filing a *pro se* Motion for Compassionate Release on May 18, 2020, the Defendant filed request for compassionate release with the Warden of his facility. That request was denied. Accordingly, the Defendant has exhausted his administrative remedies.

The Court must also find that a sentence reduction is "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The First Step Act does not say what "extraordinary and compelling reasons" warrant a sentence reduction, but the compassionate release statute directs the Court to consider the sentencing factors of 18 U.S.C. § 3553(a) when deciding compassionate release motions. *See* 18 U.S.C. § 3582(c)(1)(A).

Since passage of the First Step Act, the Sentencing Guideline policy statement has not been updated to reflect that defendants (and not only the BOP) may move for compassionate release but courts have turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction. *See United States v. Weatherspoon*, 2020 WL 3803035, at *3 (S.D. Ind. July 7, 2020) (citations omitted). The applicable guideline instructs that the Court should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release and the Court should not grant a sentence reduction if the defendant poses a risk of danger to the community, as defined in the Bail Reform Act. *See* U.S.S.G. § 1B1.13. The policy statement

provides examples of "extraordinary and compelling reasons" in the application notes. These examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1 (A)-(C).

The commentary also includes a fifth catch-all provision for "extraordinary and compelling reasons other than, or in combination with, the reasons described in subdivisions (A) through (C)," as determined by the Bureau of Prisons. The policy statement was last updated in November 2018 before the First Step Act was passed.

The Defendant states that the Court has the authority to consider whether the worsening global pandemic, along with the other relevant circumstances which include compelling family circumstances, present an extraordinary and compelling reason.

Certainly, the COVID-19 pandemic is in and of itself an extraordinary and unprecedented event in our lifetimes. However, "the mere existence of COVID-19 in society and possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). "Perhaps a prisoner could satisfy the extraordinary and compelling reasons requirement by showing that his particular institution is facing a serious outbreak of COVID-19 infections, the institution is unable to successfully

7

contain the outbreak, and his health condition places him at significant risk of complications should he contract the virus." *United States v. Melgarejo*, 2020 WL 2395982, at *3 (C.D. Ill. May 12, 2020); *see also United States v. Johnson*, 2020 WL 2573239, at *4 (C.D. Ill. May 21, 2020).

(B)

Obviously, it is difficult to prevent the introduction of COVID-19 into prison facilities and incarcerated individuals are at a higher risk of infection because of their living situations. Individuals within a prison setting are unable to take proactive steps to protect themselves from the spread of the coronavirus. Moreover, incarcerated people tend to be less healthy than the general population.

The Defendant states that the CDC and other medical authorities have found that COVID-19 is especially dangerous for people of all ages with underlying medical conditions. Those with conditions such as sickle cell disease are also especially vulnerable to and at higher risk for serious complications from COVID, including death. www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The Defendant notes that his medical records reflect a history of sickle cell anemia. The Defendant alleges BOP records provide that Defendant carries the genetic trait for sickle cell anemia and he has been told by physicians that his blood consists of Hemoglobin S, which causes red blood cells to become stiff and sickle shaped. The CDC recently added

individuals with hemoglobin disorders, but specifically sickle cell disease, to the list of at-risk health conditions for COVID.

The Government states that the medical records show that, while the Defendant may have the genetic trait for sickle cell anemia, he is not suffering from the disease, has no symptoms and has not been hospitalized for the disease. Sickle cell disease is not synonymous with sickle cell trait:

> Unlike sickle cell disease, a serious illness in which patients have two genes that cause the production of abnormal hemoglobin (the substance in red blood cells that helps carry oxygen), individuals with sickle cell trait carry only one defective gene and typically live normal lives. Rarely, extreme conditions such as severe dehydration and high-intensity physical activity can lead to serious health issues, including sudden death, for individuals with sickle cell trait.
>
> If an individual has sickle cell trait, it means that he or she carries or has inherited a single copy of the gene that causes sickle cell disease. It is not a disease. In general, people with sickle cell trait enjoy normal life spans with no medical problems related to sickle cell trait.
>
> Sickle cell trait can never become sickle cell disease. It is possible, however, for individuals with sickle cell trait to pass the gene to their children.
>
> www.hematology.org/education/patients/anemia/sickle-cell-trait

Based on that description of sickle cell trait, the Government alleges that Defendant simply does not "suffer from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 comment n.1(A)(ii). The Government further claims that

Defendant has not otherwise established "extraordinary and compelling reasons" for granting him a compassionate release.

In reply, the Defendant notes that a wealth of recent medical literature shows a demonstrable pattern of individuals with sickle cell trait being more susceptible to sudden, unexplained death due to respiratory exertion. Moreover, "patients with sickle cell trait could have the same presentation as sickle cell anemia if they are exposed to conditions that favor sickling," such as "severe hypoxia, dehydration, increase in sympathetic outflow, hypothermia/hyperthermia, high 2, 3-DPG levels and release of inflammatory cells." Damilola Ashorobi, Ruchi Bhatt, *Sickle Cell Trait* (May 4, 2019), www.ncbi.nlm.nih.gov/books/NBK537130. When a person with sickle cell is exposed to "oxidative stress," the red blood cells appear under a microscope as sickle cells. *Id*. Patients with sickle cell "traits have a propensity for medical and clinical complications," and the trait is associated with low oxygen levels and blood clots, including papillary necrosis of the kidneys, splenetic infarction (tissue death), kidney disease, and "sudden death due to exertion." *Id*. Additional research is needed to determine why some individuals with sickle cell trait have complications while others do not. www.cdc.gov/ncbddd/sicklecell/traits.html.

The Defendant alleges that, because coronavirus attacks the respiratory system and wreaks havoc on vital organs through inflammation, it reasonably

follows that all individuals who are at an increased risk of serious illness or death from respiratory distress or inflammation face an enhanced risk from COVID- including those with sickle cell trait. Although the CDC does not currently list sickle cell trait as a risk factor, the study that led them to include sickle cell disease as a risk factor did not include any test subjects with the sickle cell trait alone. Julie A. Panepinto, et al., *Coronavirus Disease among Persons with Sickle Cell Disease, United States, March 20-May 21, 2020,* Emerging Infectious Diseases vol. 26 no. 10 (*early release* Oct. 2020), wwwnc.cdc.gov/eid/article/26/10/20-2792 article ("Persons who had the sickle cell trait were not included in this registry"). The CDC website notes that the list of risk factors is subject to change based on still-developing data and newly acquired information. The Defendant notes that in one research study that has not yet been peer-reviewed, a higher rate of death from COVID-19 was found in black patients with sickle cell trait (40% with the trait versus 16% without the trait), but the trend could not be deemed "statistically significant." W. Kyle Resurreccion, et al., *Association of Sickle Cell Trait with Risk and Mortality of COVID-19; Results from the UK Biobank*, www.medrxiv.org/content/10.1101/2020.07.02.20145359v1.full.pdf+html.

The Defendant's motion concludes that, while sickle cell trait may not currently be among the risk factors explicitly listed by the CDC for COVID, a danger still exists that could result in deaths for individuals with the trait greater than for

11

those without it. The Defendant asks the Court to consider the scientific research that demonstrates his elevated risk of complications together with the dire circumstances at FCI Elkton in evaluating his request for relief. Moreover, the Court should consider that, if the Supreme Court's decision in *Johnson* was retroactive, the Defendant would no longer be incarcerated for the offenses for which he was sentenced in 2011.

The Defendant alleges that full consideration of the § 3553 factors, including the COVID-19 Pandemic, the Defendant's time served along with an additional period of home confinement, constitutes a sentence sufficient, but not greater than necessary, to satisfy the statutory goals of sentencing. Under the Supreme Court's decision in *Johnson*, moreover, the Defendant would no longer qualify as a career offender today and would be subject to a significantly lower guideline range. The U.S. Sentencing Commission has since amended the sentencing guidelines to implement its provisions removing the residual clause from the career offender definition. One of the Defendant's prior convictions that qualified him as a career offender—Aggravated Fleeing/Eluding—is thus no longer a career offender predicate. Without the career offender designation, the Defendant's guideline range would be 160 to 185 months, rather than the 262 to 327 month range which he faced at his original sentencing. Although these changes to the career offender designation did not retroactively apply to previously sentenced defendants, *see*

*Beckles v. United States*, 137 S. Ct. 886 (2017) (guidelines cannot be void-for-vagueness), the change in law is a factor the Court can consider for purposes of the motion. Based on the totality of circumstances, the Defendant asks the Court to grant him compassionate release.

Certainly, FCI Elkton experienced a serious outbreak of COVID-19 infections—perhaps one of the worst outbreaks of any BOP institution. It appears that, over the course of at least two months, FCI Elkton was unable to successfully contain the outbreak. The number of positive cases at Elkton now seems to be under control.

Although individuals with sickle cell trait can experience serious health issues, most individuals live normal lives and experience no symptoms. That appears to be the case with the Defendant. The Court recognizes that much is unknown about COVID-19 and the list of risk factors continues to evolve. At the present time, however, sickle cell trait is not among the CDC's risk factors for COVID. The possibility that Defendant has an increased risk thus is speculative. Accordingly, the Defendant has not shown extraordinary and compelling reasons that would warrant compassionate release based on the current conditions at FCI Elkton and his health situation.

The Court is mindful that, under the Sentencing Guidelines now in effect, the Defendant would have faced a lower guideline range and would very likely be out

of prison by now. However, the Court is unable to determine that is so "extraordinary and compelling" as to warrant compassionate release.

For the reasons stated herein, the Court will deny the motion for compassionate release.

<u>Ergo</u>, the Defendant's supplemental motion for compassionate release [d/e 35] is DENIED.

The Clerk will terminate the Defendant's pro se motion for compassionate release [d/e 32].

ENTER: August 21, 2020

    FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge